UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KENNY KENT,

               Plaintiff,

     v.

RANDY GROUNDS,

               Defendant.

Case No. 12-cv-05134-JD

**ORDER DENYING HABEAS PETITION**

Re: Dkt. No. 2

Petitioner Kenny Kent, a state prisoner currently in custody at Salinas Valley State Prison, seeks federal habeas relief under 28 U.S.C. § 2254. Petitioner is represented by counsel. Petitioner's main claim is that he was subject to an unduly suggestive identification procedure prior to trial. He also claims that a juror was improperly retained during trial after expressing safety concerns. The Court has carefully considered the parties' written briefs and oral arguments at the hearing, the record and governing law, and denies the petition.

**BACKGROUND**

The key facts about the identification procedure and juror issue are presented in the California Court of Appeal's opinion in *People v. Kent*, No. A127614, 2011 WL 3524442 (Cal. Ct. App. Aug. 9, 2011) (*see* Respondent's Exhibit 6). For the most part, the parties do not meaningfully dispute the facts on this petition.

Petitioner Kent's conviction and imprisonment arise out of his role in a robbery and shooting that occurred in San Francisco on September 18, 2008. In the early morning hours of that day, at about 1:30 a.m., Kent and a man named Totua Totua robbed and shot a minor, Alex O., before Kent and Totua fled together in a silver Chrysler Pacifica. Alex, who was 14 years old at the time, had been walking toward a bus stop with his cousin, Marvin, when they were

United States District Court
Northern District of California

1   approached by the two men.  Alex testified at trial that one of the men was "kind of fat" and the

2   other was bald.  2011 WL 3524442, at *1.  The larger, fatter man put a gun to Alex's chest, put

3   him against a wall, and took Alex's "cell phone and . . . around $70."  *Id*.  "The two men told Alex

4   to sit down and put a gun to his face.  Alex put his hand up and moved the gun, and the man with

5   the gun shot [Alex] in the leg."  *Id*.  Alex testified that it was Totua who shot him, but Kent

6   searched him and both men took his money and his cell phone.  Kent also searched Marvin.

7        After the incident, Alex was taken by ambulance to a hospital, where he was treated.  Alex

8   was "in pain, afraid, and crying."  2011 WL 3524442, at *1.  The police began a search for the

9   silver car that had been used as the escape vehicle.  At about 2:38 a.m., a police officer stopped the

10  car to find Kent in it, alone.  San Francisco Police Officer Rain Daugherty arrested Kent, searched

11  him, and found three cell phones in his pocket.  One of them was Alex's.  Daugherty "gave the

12  phone to an Officer Dudy, 'so it could be brought to General Hospital and it could be looked at by

13  the victim . . . .'"  *Id*. at *3.  Officer Dudy did not testify at trial.

14       Back at the hospital, Alex was interviewed by the police and participated in the first of two

15  identification events.  Alex told them that the bald man took his cell phone and the fat one his

16  money.  A police officer testified at trial that Kent "did have a bald head" at the time.  2011 WL

17  3524442, at n.4.  "After Alex gave the police these descriptions, shortly before 4:00 a.m., the

18  police brought Kent to his hospital room and asked Alex if he was one of the assailants.  Alex said

19  he was not."  *Id*., at *2.  (The parties and the California Court of Appeal refer to this as the "cold

20  show" or "reverse cold show.")

21       Alex testified at trial that after he saw Kent in his hospital room (and did not identify him

22  as one of his assailants), a police officer asked him for his (Alex's) cell phone number.  "At some

23  unidentified point after this request, Alex was shown his [recovered] phone and told that Kent had

24  been found in possession of it."  2011 WL 3524442, at *2.  "Although Alex testified that he had

25  been shown the phone and told it had been found in Kent's possession, he did not say whether he

26  had been shown the phone before he identified Kent the second time or after."  *Id*., n.6.  The police

27  officer who was said to have brought the phone to the hospital so Alex could look at it did not

28  testify.

United States District Court
Northern District of California

1    The second identification event occurred in the afternoon of the same day, September 18,

2    2008.  San Francisco Police Officer Barcena came to the hospital to conduct a photographic line-

3    up.  Even before he looked at any of the photographs, "Alex told Barcena that the man they'd

4    brought to his hospital room earlier that day was, in fact, one of the men who had robbed him."

5    2011 WL 3524442, at *2.  "Alex told Officer Barcena that he'd failed to identify Kent earlier

6    because Kent had changed his shirt.  Alex testified at trial that he initially refused to identify Kent

7    because he was afraid that Kent would kill him.  In addition, at the time of the reverse cold show,

8    Alex was wearing an oxygen mask, confused and in pain."  *Id*.

9    After seeing the photographs, Alex identified the one of Totua Totua as depicting the man

10   who had shot him.  At trial, Alex also identified a gun he was shown as being "the same as" the

11   gun he was shot with by Totua.  2011 WL 3524442, at *2.

12   After his arrest, Kent was put into a county jail, and then a holding station.  In a series of

13   routine recordings of telephone calls between Kent and his girlfriend, Rochelle Terrell, Kent's

14   description of the night of the robbery evolved.  Initially, he admitted only "that he had been

15   present at the scene, but had driven off as soon as gunshots had been fired, later dropping off his

16   'comrade Coleone' before he was arrested."  2011 WL 3524442, at *3.  (Totua Totua had the

17   name "Coleone" tattooed in large letters down his forearm.  *See id*. at n.7.)  Ultimately Kent

18   admitted to Terrell "that he was present during the 'situation' with his 'Samoan partner.'"  *Id*. at

19   *3.

20   Kent was tried separately from Totua.  "Mid-way through trial," a juror called the court

21   clerk to "express[] a concern to the Court about a security issue."  2011 WL 3524442, at *8.  The

22   judge conducted a voir dire examination, during which the juror asked if there had "ever been an

23   incidence of retribution against jurors."  *Id*.  Based on her answer that she would "feel more

24   comfortable if the defendant were not present," Kent was excused, and the juror "expressed a

25   concern about the mug shot she had seen of the second person in the car with Kent."  *Id*., at *9.  At

26   the court's questioning, the juror averred that she understood that "that person -- there is no other

27   individual before us for trial."  *Id*.  She also affirmed that she would "be able to follow the court's

28   instructions that you're not to speculate about" a second person.  *Id*.  She further affirmed that she

3

1   understood the presumption of innocence and was "willing to follow the Court's instruction and

2   continue with that presumption of innocence throughout the trial until and unless you were to

3   decide in deliberations, after hearing all the evidence, that it was no longer true." *Id*. Finally,

4   when the court asked if the juror believed "that you're not going to be able to serve as a fair and

5   impartial juror in this case," the juror replied, "I can set it aside. Is it uncomfortable? Yes. Two

6   different issues. Not going to affect my objectivity . . . . [¶] I can be impartial, because he has

7   done nothing wrong against me. If I am presuming him innocent, that doesn't mean I'm not more

8   uncomfortable than when I arrived today." *Id*.

9       After a brief side-bar conference, the court asked the juror to continue to serve on the jury,

10   stating, "I have heard what you said, that discomfort is one issue, but you'll be able to set that

11   aside and follow the instructions of the Court, so that you can be a fair and impartial juror in this

12   case." 2011 WL 3524442, at \*10. After the juror left the room, defense counsel asked that she be

13   excused, but the court denied the request and agreed with the government that cause had not been

14   established.

15       At the conclusion of the trial, the jury convicted Kent of one count of robbery, one count of

16   attempted robbery, and two counts of assault with a firearm. He was sentenced to an

17   indeterminate term of 25 years to life for the robbery of Alex, and given three concurrent terms on

18   the remaining convictions.

19       Petitioner filed a direct appeal, and on August 8, 2011, the California Court of Appeal

20   ruled that the trial court erred when it imposed a concurrent term on the second assault conviction

21   (and therefore stayed that sentence), but otherwise affirmed the judgment of conviction in all other

22   respects. In doing so, the Court of Appeal rejected petitioner's substantive claims of error on the

23   merits, which included the two grounds for relief that are now pending before the Court. The

24   California Supreme Court denied Kent's petition for review on October 12, 2011, and it also

25   denied Kent's pro se petition for writ of habeas corpus in a single sentence opinion issued on

26   July 27, 2011.

27       On October 3, 2012, petitioner initiated this federal action. His amended petition asserts

28   two grounds for federal habeas relief. He argues that the state court proceedings resulted in

United States District Court
Northern District of California

4

1   decisions that were "contrary to, or involved an unreasonable application of clearly established

2   Federal law" in violation of 28 U.S.C. § 2254(d)(1).  He asserts that this is the case because his

3   conviction has been upheld despite the fact that:  (1) he was subjected to an unduly suggestive

4   identification procedure, and (2) the trial court failed to excuse a fearful juror.  Dkt. No. 2.

5   **GOVERNING STANDARD**

6   The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs federal habeas

7   review and sets a very high bar for petitioners to cross.  Under AEDPA, a federal court may not

8   grant a habeas petition for any claim that was adjudicated on the merits in state court unless the

9   state court's adjudication of the claim resulted in (1) a decision that was "contrary to, or involved

10   an unreasonable application of, clearly established Federal law, as determined by the Supreme

11   Court of the United States," or (2) a decision that was based on an "unreasonable determination of

12   the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

13   At oral argument, petitioner's counsel conceded that he was making a Section 2254(d)(1)

14   argument only.  He was not invoking Section 2254(d)(2) in seeking habeas relief for the petitioner.

15   Consequently, in determining this petition, the Court focuses on the standards that govern a

16   claim under Section 2254(d)(1) only.  Under the "contrary to" clause in that prong, "a federal

17   habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by

18   [the Supreme] Court on a question of law or if the state court decides a case differently than [the]

19   Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13

20   (2000).  "[A]s the statutory language makes clear," under Section 2254(d)(1), the "source of

21   clearly established law" is restricted to the Supreme Court's jurisprudence.  *Id*.

22   The "unreasonable application" language in Section 2254(d)(1) has also been tightly

23   construed.  Under controlling precedent, "an *unreasonable* application of federal law is different

24   from an *incorrect* application of federal law."  *Harrington v. Richter*, 562 U.S. 86, 785 (2011)

25   (emphasis in original; quoting *Williams*, 529 U.S. at 410).  "A state court's determination that a

26   claim lacks merit precludes federal habeas relief so long as 'fair-minded jurists could disagree' on

27   the correctness of the state court's decision."  *Id*. (quoting *Yarborough v. Alvarado*, 541 U.S. 652,

28

United States District Court
Northern District of California

1  664 (2004)).  Section 2254(d) applies even where the state court summarily denied the state

2  habeas petition without a reasoned opinion.  *See Harrington*, 131 S. Ct. at 784.

3        If this standard under Section 2254(d) "is difficult to meet, that is because it was meant to

4  be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court

5  relitigation of claims already rejected in state proceedings."  *Id*. at 786.

6  **DISCUSSION**

7  **I.   THE IDENTIFICATION PROCEDURE**

8        As his main claim, petitioner argues that "the decisions of the California courts finding that

9  the petitioner's right to due process of law as guaranteed by the Fifth and Fourteenth Amendments

10  to the United States Constitution was not violated when the petitioner was subject to an unduly

11  suggestive identification procedure represented an unreasonable application of applicable federal

12  law."  Dkt. No. 2 at 7-8.

13        But even before getting to the question of applicable federal law, the petition must be

14  denied on this ground because petitioner has failed to establish the factual predicate on which his

15  argument hinges -- *i.e.*, that he was subjected to an unduly suggestive identification procedure.

16  The Court of Appeal stated that "[a]t some unidentified point after" the police officer's request for

17  Alex's phone number, Alex was "shown his [recovered] cell phone and told that Kent had been

18  found in possession of it."  2011 WL 3524442, at *2.  The Court of Appeal noted that in his

19  testimony, Alex "did not say whether he had been shown the phone before he identified Kent the

20  second time or after."  *Id*., n.6.

21        In the petition, Kent states as fact that Alex was shown the phone and told that Kent had

22  been found in possession of it after the reverse cold show, but before the second, positive

23  identification of Kent by Alex.  *See* Dkt. No. 2 at 10-11 ("The Petitioner was brought for a 'cold

24  show identification,' but [Alex] said the Petitioner was not involved in the crimes at issue.  [Alex]

25  later identified the seized cell phone as the one that was taken from him.  At the time the phone

26  was returned to the Appellant, which was the day after the negative identification, police officer

27  Daughtery told Ortega that the police had been seized from the Appellant.  *Thereafter*, the

28  Petitioner was able to identify the Petitioner as one of his assailants.") (emphasis added).

United States District Court<br>Northern District of California

6

United States District Court
Northern District of California

1    Although vigorously pressed by counsel in the briefs and by the Court at the hearing,

2    petitioner's argument is fatally short on supporting evidence in the record.  *See*, *e.g.*, Dkt. No. 2 at

3    11 ("How else to explain [Alex] Ortega's miraculous ability to identify the Petitioner as an

4    assailant after an initial negative identification?  What fact or occurrence caused this change?

5    Quite clearly, it was police misconduct that allowed for a positive identification.").

6    A "logical and common sense argument" (*see* Dkt. No. 30 at 4), however, is not enough to

7    carry the day on a federal habeas petition.  In response to the Court's requests at the hearing that

8    counsel specifically identify the evidence establishing that Alex was shown the recovered cell

9    phone *before* his second, positive identification of petitioner, counsel repeatedly cited page 169 of

10   the trial transcript and averred that he was going to "live or die" on that cite.  But after the hearing,

11   counsel submitted a letter stating that "the reference [he] made to page 169 of the trial transcript

12   was incorrect," and he "should have referred to page 169 of the preliminary hearing transcript

13   instead."  *See* Dkt. No. 36.  In its post-hearing submission, the government also noted that

14   petitioner's "quoted language ('RT 169') was to the preliminary hearing transcript, which was not

15   admitted at trial."  Dkt. No. 33.[1]

16   This alone is enough to defeat petitioner's argument that the California Court of Appeals

17   engaged in an "improper application of federal law to the facts of the case" (*see* Dkt. No. 2 at 11)

18   by failing to read the transcript and not basing its opinion on the record as it existed.  Petitioner

19   never put forward -- and he expressly abandoned at the hearing -- any argument under 28 U.S.C.

20   § 2254(d)(2) that the Court of Appeals' factual determination was unreasonable in light of the

21   evidence presented in the state court proceeding.[2]  As petitioner has now admitted, the

22

23   _____

     [1] Page 169 of the preliminary hearing transcript contains this question and answer -- Q: "Before
24   you told the officers that Kenny Kent was one of the robbers, you were told that he was found
     with your cell phone; isn't that true?"  A:  "Yes."

25   [2] Such an argument would have failed to carry water in any event.  A review of the preliminary
26   hearing transcript shows that Alex's testimony on this point was far from clear.  *See*, *e.g.*,
     Respondent's Exhibit 10 (Preliminary Hearing Transcript) at 170:17-19 (Q: "[Y]ou told him he
27   was the one after they told you about the cell phone.  Isn't that what you just said?"  A: "No.  I said
     it was him.  I said it was him."); 173:6-12 (Q: "From the time that you did not identify Mr. Kent,
28   how soon after that time did you learn that Mr. Kent was in possession of your cell phone?"  A:
     "Some minutes afterwards.").

1    foundational testimony on which he has based his argument was not contained in the trial

2    transcript at all.  Moreover, he has failed to identify any Supreme Court precedent that would even

3    have allowed the state court -- or this Court -- to rule on his constitutional due process arguments

4    on the basis of a stray question-and-answer contained in a preliminary hearing transcript that was

5    neither admitted nor contradicted at trial.  The Court therefore denies the petition on this ground.

6    **II.  FAILURE TO EXCUSE FEARFUL JUROR**

7          Petitioner's other claim asserts that "the decisions of the California courts finding that the

8    petitioner's right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to

9    the United States Constitution and the right to a fair trial as guaranteed by the Sixth and

10    Fourteenth Amendments to the United State Constitution were not violated when the trial court

11    failed to excuse a fearful juror represented an unreasonable application of applicable federal law."

12    Dkt. No. 2 at 12.

13          Putting aside the fact that the Court is doubtful that petitioner has established, as a matter

14    of fact, that the trial court failed to excuse a "fearful" juror, petitioner has failed to identify any

15    United States Supreme Court case that the California state court's decision was purportedly

16    "contrary to" or which it unreasonably applied.  Significantly, petitioner's counsel conceded at the

17    hearing that he did not have a Supreme Court case that he could point the Court to.  This is fatal

18    under Section 2254(d)(1).

19          Although counsel argued that this was a matter of "fundamental fairness," it is not within

20    the power of this Court to grant a federal habeas petition on that ground.  AEDPA "preserves

21    authority to issue the writ in cases where there is no possibility fairminded jurists could disagree

22    that the state court's decision conflicts with [the Supreme] Court's precedents.  It goes no farther."

23    *Harrington*, 562 U.S. at 786.  Moreover, the Supreme Court has instructed that "habeas corpus is

24    not to be used as a second criminal trial, and federal courts are not to run roughshod over the

25    considered findings and judgments of the state courts that conducted the original trial and heard

26    the initial appeals."  *Williams*, 529 U.S. at 383.

27          Without a citation to a relevant Supreme Court case as the "source of clearly established

28    law," petitioner's Section 2254(d)(1) juror claim must be denied.  The Court cannot, and will not,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    re-visit the state court's rulings on this issue purely as a matter of "fundamental fairness," as the

2    petitioner has urged.

3                                            **CONCLUSION**

4            Although petitioner has also requested an evidentiary hearing, the Court denies that

5    request.  Petitioner's counsel has not articulated what he would proffer in an evidentiary hearing

6    that might be germane to his claims beyond the materials already presented.  In addition, petitioner

7    has not met the requirements of Section 2254(e)(2) for being permitted an evidentiary hearing

8    despite having "failed to develop the factual basis of a claim in State court proceedings."

9            Consequently, the Court denies the habeas petition.  The Court also denies a certificate of

10   appealability pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has

11   failed to make a "substantial showing of the denial of a constitutional right" on any of his claims.

12   *See* 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining

13   that an applicant satisfies this standard where he or she shows that reasonable jurists could find the

14   issues debatable or that the issues are "adequate to deserve encouragement to proceed further")

15   (internal quotation omitted).

16           The Clerk of the Court is directed to enter judgment and close the file.

17           **IT IS SO ORDERED**.

18   Dated:  October 10, 2014

19   _____

20   JAMES DONATO
     United States District Judge

21

22

23

24

25

26

27

28

9